975 So.2d 3 (2007)
STATE of Louisiana
v.
Joshua A. GONZALEZ.
No. 07-KA-449.
Court of Appeal of Louisiana, Fifth Circuit.
December 27, 2007.
*4 Paul D. Connick, Jr., District Attorney, Terry Boudreaux, Thomas J. Butler, Appellate Counsel, Donald A. Rowan, Trial Counsel, Assistant District Attorneys, Gretna, Louisiana, for Appellee, State of Louisiana.
James A. Williams, Attorney at Law, Gretna, Louisiana, for Appellant, Joshua A. Gonzales.
Panel composed of Judges SUSAN M. CHEHARDY, CLARENCE E. McMANUS, and GREG G. GUIDRY.
SUSAN M. CHEHARDY, Judge.
On December 16, 2004, the Jefferson Parish Grand Jury returned an indictment charging defendant, Joshua A. Gonzalez, with second degree murder of Akbar Smith, in violation of La. R.S. 14:30.1, and attempted second degree murder of Raymond Nelson, in violation of La. R.S. 14:30.1 and 14:27. Defendant was arraigned and pled not guilty.
*5 On October 5, 2006, defendant waived his right to a jury trial and the matter proceeded in a bench trial. After the presentation of evidence, the trial judge found defendant guilty as charged of second degree murder but acquitted defendant on the charge of attempted second degree murder. On October 20, 2006, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant filed a timely motion for appeal, which was granted.
Facts
At trial, Joshua Nieves testified that, on October 22, 2004, defendant called him to inquire about purchasing marijuana and cocaine. Nieves agreed to sell the narcotics to defendant for $400.00. Nieves, Akbar Smith, and Raymond Nelson devised a plan to rob defendant, instead of selling him narcotics. According to the plan, Nieves would take defendant's money and proceed on foot to retrieve the narcotics from an undisclosed location. Smith would pretend to assault Nieves and take defendant's money before Nieves had retrieved the narcotics. Smith and Nieves would then flee with defendant's money.
At approximately 10:30 p.m., Nieves met defendant at an apartment complex in Terrytown. As planned, Nieves took defendant's money, under the guise of obtaining the drugs from a hidden location. As Nieves walked away from defendant, Nieves passed a breezeway between apartment buildings and Smith knocked him down, causing Nieves to drop the money. Smith then picked up the money and fled. Nieves immediately followed Smith. At that point, Nieves heard five or six shots and saw Smith fall to the ground. Nieves did not see what defendant was doing because it was dark.
Dr. Susan Garcia, a stipulated expert in the field of forensic pathology, testified that she performed an autopsy on Smith. She further testified that a bullet entered the back of his Smith's neck, severed his spinal cord, and killed him.
Detective David Morales of the Jefferson Parish Sheriff's Office (JPSO) testified that he developed defendant as a suspect. When defendant eventually turned himself in, Detective Morales advised him of his rights. After defendant waived his rights, he gave a statement.
In his first statement on October 24, 2004, defendant explained that he had stopped for gas when he saw the apartment complex. Because he was looking for a new place to live, he parked in the lot to check out the area. As he was doing so, Nieves came up to him. While they were talking, two other people came up to defendant, pushed him to the ground and took his money. Defendant said that he "blacked out," went to his car to get his Smith and Wesson 9 mm semi-automatic handgun, and chased them. Defendant stated that he did not want to shoot at them but that he meant to shoot in the air to try to stop them so he could get his money back. He admitted that he "could not" lift his arm when he was shooting and could not stop firing. Defendant explained that, after the shooting, he got scared and left. He told the detective that the gun he used was in the trunk of his vehicle.
When Detective Morales realized that defendant's statement was inconsistent, he took a second statement from defendant. In his second statement dated October 24, 2004 at 2:33 p.m., defendant said that he did not tell the complete truth during the first statement because he was scared. Defendant explained that he received a call from his friend, Daliah, who told him that she knew some people who could get any drugs he wanted. After a few phone calls with Nieves, defendant agreed to purchase marijuana and cocaine for $425.00.
*6 Defendant went to the parking lot near the Chevron station and waited there. After another phone call from Nieves in which he heard several other voices in the background, he thought that the men intended to rob him. Before exiting his vehicle, defendant picked up his gun, chambered a round and put the gun in the back of his belt.
Nieves suddenly approached him and told him that "they" needed the money before they could give him the drugs. Defendant gave Nieves the money and then began to follow him to see where he was going.
Defendant indicated that, before Nieves turned the corner, he was "assaulted," but he was "not touched." Nieves fell backwards and threw the money in the air. Defendant said that the other "guy" picked up the money and "they" ran off. He stated that the assault appeared "fake" to him, and he thought that they had set him up. He indicated that he "just got mad," "lost control," and "blacked out." He "meant to shoot at the air to try and get them to stop running but . . . just couldn't lift [his] arm up, . . . just couldn't stop shooting."
Defendant stated that he was approximately 50 or 60 feet away from them, so he did not think that he was going to hit any of them when he fired his weapon. He saw one of the black males dive down like he was trying to avoid being shot. Defendant admitted that he was surprised that two of the males were wounded because he only aimed at one. He also stated that he was "only firing at one and the other one was way out of reach." He told the detectives that he had placed the ammunition clip that he used on the night of the shooting near the trunk of a tree at his cousin's house in Gonzales, Louisiana.
Detective Morales testified that, after obtaining a search warrant for defendant's vehicle, he recovered a Smith and Wesson semi-automatic 9 mm pistol from defendant's trunk. Upon checking the pistol, Detective Morales discovered that there was one live round in the chamber. Detective Morales also recovered two Smith and Wesson 9 mm clips: one from defendant's cousin's backyard in Gonzales, and one from defendant's house in Marrero.
Defendant testified at trial that his friend, Daliah Hackling, called and told him she knew some people from whom he could purchase drugs. Through a series of telephone calls, Nieves gave defendant directions to the apartment complex. During those calls, defendant heard voices in the background. Defendant testified that he was in his car at the apartment complex when Nieves showed up, and that Nieves did not see him at first. When he saw Nieves coming up by himself, defendant grabbed his gun, chambered a round, and put the gun in the back of his belt underneath his shirt.
After defendant exited his vehicle, Nieves approached him and asked for the money. Defendant gave Nieves $430.00. Nieves, in turn, told defendant that he was going to get the drugs, and to wait in that spot. Defendant did not know where Nieves was going, so he followed him. He testified that Nieves had barely made it to the corner of the first apartment building, when an unknown man, later identified as Smith, assaulted Nieves. Defendant said he knew that the men were trying to set him up, because Nieves fell backwards, even though Smith had barely touched him.
After Nieves dropped the money on the ground, Smith picked it up and started running. Defendant testified that he intended to chase Smith to get his money back, but, when he turned the corner, he saw Nelson coming towards him. He admitted *7 that he did not mention seeing Nelson in his statements.
When defendant realized they were trying to rob him and that anything could happen, defendant ran back towards his car. As he did so, he aimed the gun in their direction and fired three shots. Defendant testified that he could not see what he was shooting at because there were no lights in the area, and he was at least 40 or 50 feet away from them. Afterwards, defendant got in his car, drove back to Gonzales, and stayed at his cousin's house. He claimed that he did not know at that time he had hit any of them.
In his sole assignment of error, defendant argues that the trial court erred in finding the defendant guilty of second degree murder where there were no facts to support this conclusion. Defendant contends that the evidence was insufficient to support a second degree murder conviction because the State failed to show that he had the specific intent to kill or to inflict great bodily harm. He contends that the trial judge erred when he stated that defendant's conduct amounted to criminal negligence, yet still found him guilty of second degree murder. He also contends that the trial judge misstated the law applicable to manslaughter. He maintains that the evidence shows, at most, that he committed manslaughter.
The State responds that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant was guilty of second degree murder.
After hearing the testimony and considering the evidence, the trial judge found defendant guilty as charged of the second degree murder of Akbar Smith. He stated in pertinent part:
Article 32 of our Criminal Code, negligent homicide reads, that negligent homicide is the killing of a human being by criminal negligence, and it certainly was criminal negligence.
Then we get to manslaughter, which is a homicide which would be murder under Article 30, Article 30.1, where the offense is committed in sudden passion or heat of blood, immediately caused by provocation sufficient to deprive an average person of self control and cool reflection.
Provocation, the way I read the statute, would mean that the defendantthe defendant would have to be in fear of his life, or the life of someone else.
Even the police aren't allowed to shoot a felon running away from them, so I'm going to have noI don't believe that any shots were fired towards Mr. Gonzalez, and we have no evidence that any of theeither the victim or the other subjects there had weapons, so I'm going to have to find him guilty of this charge.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Boss, 03-133, p. 4 (La.App. 5 Cir. 5/28/03), 848 So.2d 75, 77, writ denied, 03-1968 (La.5/14/04), 872 So.2d 508.

*8 [I]n cases relying on circumstantial evidence to prove one or more elements of the crime, when the fact-finder reasonably rejects the hypothesis of innocence advanced by the defendant at trial, that hypothesis fails, and the verdict stands unless the evidence suggests an alternative hypothesis sufficiently reasonable that rational jurors could not find proof of the defendant's guilt beyond a reasonable doubt.
State v. Pigford, 05-0477, p. 6 (La.2/22/06), 922 So.2d 517, 521.
Second degree murder is defined as the killing of a human being when the offender 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, even though he has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A). See State v. Kirkland, 01-425, p. 6 (La. App. 5 Cir. 9/25/01), 798 So.2d 263, 268, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415. In the instant case, the State apparently proceeded under the first theory of second degree murder.
Under the first theory of second degree murder, the State must prove that defendant had the specific intent to kill or to inflict great bodily harm. State v. Kirkland, 01-425, p. 7, 798 So.2d at 268. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Id. Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Graham, 420 So.2d 1126, 1127 (La.1982); State v. Young, 05-702, p. 6 (La.App. 5 Cir. 2/14/06), 938 So.2d 90, 95. The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Hidalgo, 95-319, pp. 14-15 (La. App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197-98. Whether a defendant possessed the requisite intent in a criminal case is for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Meyers, 95-750, p. 8 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, 1383, writs denied, 97-0015 (La.5/9/97), 693 So.2d 766, 98-2530 (La.2/5/99), 737 So.2d 745, 00-0995 (La.12/8/00), 775 So.2d 1079.
In this case, we find that there was ample evidence to support defendant's second degree murder conviction. Specifically, the facts established by the direct evidence and inferred from the circumstances established by that evidence, viewed in the light most favorable to the prosecution, were sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
The record reflects that defendant loaded his gun and hid it in the back of his belt prior to the drug transaction because he thought Nieves and his friends were going to rob him. After defendant gave his money to Nieves, witnessed the staged robbery, and realized he had been robbed, he aimed the gun in the direction of Smith and Nieves, who were fleeing, and fired three shots. He admitted that he was aiming mainly at one of the men so he was surprised that he shot both of them. Although defendant claims that he did not have the specific intent to kill Smith or to inflict great bodily harm on him, the act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Hidalgo, 668 So.2d at 1197-98.
*9 Defendant further argues that the trial court erred when it stated that his conduct amounted to criminal negligence, yet still found him guilty of second degree murder. Negligent homicide is "the killing of a human being by criminal negligence." La. R.S. 14:32.A. "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12. We agree that the trial judge stated that the defendant's actions were criminally negligent but our reading of the judge's comments indicate that he found that defendant's act of shooting at the fleeing robbers went beyond negligent to become intentional, which supports the finding of second degree murder.
Defendant next argues that the trial court erred when it misstated the law applicable to manslaughter. To support a conviction of manslaughter, the evidence must show that the homicide, which would have been second degree murder, was committed in "sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31(A)(1). See also State v. Hicks, 01-1064, p. 7 (La.App. 5 Cir. 4/10/02), 817 So.2d 192, 197, writ denied, 02-1580 (La.5/30/03), 845 So.2d 1068. The provocation shall not reduce the homicide to manslaughter, if it is proven that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. La. R.S. 14:31(A)(1). See also State v. Gant, 06-232, p. 10 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1112, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599.
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors which may reduce the grade of the offense. State v. Johnson, 01-1362, p. 11 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. Id., 01-1362 at pp. 11-12, 820 So.2d at 610. Provocation and time for cooling are questions for the fact finder to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434, p. 5 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002).
In State v. Armant, 97-1256 (La.App. 5 Cir. 5/27/98), 719 So.2d 510, writs denied, 98-1884 (La.11/20/98), 729 So.2d 3, and 98-1909 (La.11/20/98), 729 So.2d 4, the defendant was convicted of attempted second degree murder in a bench trial. On appeal, the defendant argued that the State failed to prove he had the specific intent to kill, which was required to support a conviction for attempted second degree murder. Id., 97-1256 at p. 9, 719 So.2d at 514-15. This Court noted that the trial judge might have misapplied the law in arriving at his verdict, since the trial judge stated that he had to look at whether there was specific intent to kill or to inflict great bodily harm. With due process considerations in mind, this Court found that the test to be applied depended upon the facts of the particular case. Id., 97-1256 at 15, 719 So.2d at 517. After a lengthy discussion of the law, this Court used a harmless error analysis. Id.
This Court in Armant found that the evidence proved that defendant had the specific intent to kill the victim. It further *10 found that the trial judge's verdict was unattributable to the statements he made prior to convicting the defendant. Even though the trial judge referred to the threat of bodily injury, this Court noted that other comments made by the trial judge indicated that he also believed the defendant intended to kill the victim. Id., 97-1256 at p. 16, 719 So.2d at 517-18.
In a case similar to Armant, State v. Lewis, 34,805 (La.App. 2 Cir. 6/22/01), 793 So.2d 302, the defendant was convicted of attempted second degree murder in a bench trial. On appeal, the defendant argued that the trial court used the wrong law in finding him guilty. The appellate court stated that, even though the trial court made an incorrect utterance regarding specific intent, its factual finding that the defendant shot the victim in the face or head was sufficient to infer the defendant's specific intent to kill the victim. Citing Armant, the appellate court found that any error in the trial court's utterance was harmless under the particular facts of this case. Id., 34,805 at p. 10, 793 So.2d at 308.
In the instant case, defendant is correct that the trial judge misstated the law on manslaughter when he said that the provocation referred to in the statute meant that defendant would have to be in fear of his life or the life of someone else. Nevertheless, under the facts of this case, we find that those errors were harmless, since there was ample evidence to show that defendant had the specific intent to kill or to inflict great bodily harm on the victim sufficient to convict him of second degree murder. See Armant, supra; Lewis, supra.
Based on the foregoing, we find that, when viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant was guilty of second degree murder. Accordingly, this assignment of error lacks merit.
Finally, we have reviewed the record for errors patent, according to La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We note that the trial court failed to inform defendant of the time limitations within which he must apply for post-conviction relief. La.C.Cr.P. art. 930.8 provides that a defendant has two years from the date the judgment of conviction and sentence has become final in which to apply for post-conviction relief. Therefore, we remand this matter to the trial court to properly inform defendant of the prescriptive period by sending him written notice within ten days of the rendition of this opinion and to file written proof in the record that defendant received such notice. State v. Vance, 06-465, p. 9-10 (La.App. 5 Cir. 12/12/06), 948 So.2d 1106, 1112, writ denied, 07-0062 (La.9/21/07), 964 So.2d 331.
AFFIRMED; REMANDED.