MARC E. JOHNSON, Judge.
^Defendant, Brandon D. Earls, appeals his second degree murder conviction from the 24th Judicial District Court, Division “M”. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On December 10, 2009, the Jefferson Parish Grand Jury indicted Defendant with second degree murder in violation of LSA-R.S. 14:30.1. Defendant was arraigned the next day and pleaded not guilty. On November 8-10, 2011, the case was tried before a 12-person jury that found Defendant guilty as charged. Defendant’s motion for new trial was denied after a hearing on December 12, 2011. On that same date, after Defendant waived sentencing delays, the trial judge sentenced him to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. On December 28, 2011, Defendant filed a timely motion for appeal that was granted.
The following facts were obtained from the testimony at trial.
lain 2009, Dominique Sanders and Defendant were living together in an apart *1152 ment on Martinique Avenue in Kenner with Defendant’s cousin, Ronald Walker, In the middle of August of 2009, Ms. Sanders broke up with Defendant because he physically abused her; however, they were still living together. Ms. Sanders subsequently became romantically involved with Terry Lewis. On the night of September 2, 2009, Ms. Sanders was at 3633 Martinique Ave. with Defendant, and Defendant told her to come inside. She went inside and spoke with Defendant. During their conversation, Ms. Sanders told Defendant that she and Mr. Lewis were “talking.”
When Ms. Sanders tried to go back outside, Defendant slung her on the sofa and told her he wanted to be with her. She told Defendant she would be with him if he let her go; so, Defendant let her go, and she went outside. Ms. Sanders then called Mr. Lewis, and they met in the front of Martinique Ave. Ms. Sanders and Mr. Lewis went to a gas station and returned. When they returned, Bianca Cloud, a neighbor, called and asked if Mr. Lewis could bring her to Burger King. Ms. Cloud then met Ms. Sanders and Mr. Lewis at the car on Martinique Ave.
At some point, Defendant came up to the car and pulled on the handle of the passenger side door where Ms. Sanders was sitting. Defendant told Ms. Sanders to get out of the car because he wanted to talk to her. Mr. Lewis exited the car, walked around it, pushed Defendant, and told Defendant that Ms. Sanders did not have to get out of the car if she did not want to. Defendant walked away and said to Angie Cloud, another neighbor, “I’m a[sic] kill that b*tch.” Mr. Lewis got back into the car. Ms. Sanders, Mr. Lewis, and Bianca Cloud then went to Burger King, and afterwards, they returned to Martinique Ave.
Defendant and Ronald Walker, Defendant’s cousin, walked toward the car, and Ms. Sanders told Bianca Cloud to pull around the back, so she did. Bianca |4CIoud went inside her apartment, and Ms. Sanders and Mr. Lewis sat in the car and talked for approximately 30 minutes. Ms. Sanders and Mr. Lewis subsequently exited the car, and they talked some more, hugged and kissed. As they did so, Ms. Sanders heard something in the bushes, and Mr. Lewis’ eyes became wide. Afterward, someone came out and started shooting. Ms. Sanders screamed, and she and Mr. Lewis started running. She went inside Bianca Cloud’s apartment and heard approximately three more gunshots. Ms. Sanders heard Mr. Lewis say, “Oh, sh*t.” Bianca Cloud also heard gunshots and called the police.
At approximately 12:55 a.m. on September 3, 2009, Officer Christine Urrata of the Kenner Police Department heard a dispatch over the police radio regarding gunshots and someone wounded in a rear alley of 3541 Martinique Ave. She immediately proceeded to that location. As Officer Ur-rata approached, she observed a white vehicle with bullet holes in the vehicle and the driver’s side window shattered. She also observed a subject’s feet in front of the vehicle and a red substance that looked like blood.
Officer Urrata knocked on the door of a nearby apartment to search for witnesses and/or suspects. Ms. Sanders spoke to Officer Urrata, telling her she could not believe Defendant would do this. Officer Urrata recalled that she had stopped Defendant in that same alleyway during a routine patrol just one hour prior. She did so because Defendant and others, including a young child, were out very late at night on a weeknight, bouncing a basketball. Officer Urrata reviewed her notes from that earlier stop, obtained Defendant’s address, and notified other respond *1153 ing officers of Defendant’s possible location.
Officer Jeff Mocklin of the Kenner Police Department heard the broadcast over the radio. Officer Mocklin went to Defendant’s address, knocked on the door, and asked if Defendant was there. A black male answered the door and said IsDefendant was in the bathroom. The officers opened the bathroom door and saw a black male later identified as Defendant standing in front of a sink wiping his hands off in the sink. Officer Mocklin smelled bleach and observed a bottle of bleach below him in an open cabinet.
Officer Urrata was notified over the radio that Defendant was located inside of Apartment C at 3633 Martinique Ave. Officer Urrata went to that address and saw that Defendant had already been secured. She noticed that Defendant was “kind of chuckling a little bit” and had a “little bit of a smart alecky” kind of demeanor, unlike his earlier demeanor which was very agitated and aggressive. She also noticed at that time, Defendant was clad in a black t-shirt and dark colored blue jeans, unlike earlier when he was wearing red striped pajama pants and a white t-shirt.
Ms. Sanders was subsequently taken to the Kenner Police Department where she gave two statements. In her first statement, Ms. Sanders was not completely honest because she was scared of Defendant; however, in her second statement, she identified Defendant as the shooter. She testified that Defendant, while wearing a black hoodie, shot Mr. Lewis using a revolver. Ms. Sanders further testified that she could not see all of Defendant’s face that night, but she could see his top teeth as he was biting on his bottom lip, an expression she had seen on Defendant’s face before. She was certain that Defendant was the person who shot Mr. Lewis that night.
Detective Michael Cunningham of the Kenner Police Department advised Defendant of his rights. After Defendant waived them, he gave a statement confessing to the shooting, which was played for the jury. Detective Charlotte Synigal was present during Defendant’s statement as well. In the statement dated September 3, 2009, Defendant said that after Mr. Lewis pushed him away from the [ ficar, he went home, changed his clothes, came back, and shot Mr. Lewis with a revolver. Defendant stated that he was wearing a black hoodie at the time he shot Mr. Lewis. Afterwards, Defendant threw the gun into a canal and ran back to his cousin’s house.
Detective Shawn Watson of the Kenner Police Department obtained a search warrant for Defendant’s apartment and recovered a box of Winchester 9 mm Luger rounds, a gallon of Clorox bleach, a black hooded sweatshirt, and a box of Defendant’s checkbooks. Projectiles and fragments of projectiles were also found at the scene of the shooting.
Dr. Karen Ross, a forensic pathologist, performed the autopsy on Mr. Lewis. She testified that the cause of death was multiple gunshot wounds, and the manner of death was homicide.
Gerald Roser, a crime scene technician for the Kenner Police Department, performed a gunshot residue test on the palm of the victim’s hand, and the results were a presumptive positive. He also performed a gunshot residue test on Defendant that was negative. Mr. Roser explained that a gunshot residue test was performed to determine if a person fired a weapon or if a person was in close proximity to a shooter.
Colonel Timothy Scanlan, who was qualified as an expert in the field of firearms and tool mark examination, examined a projectile and the outer part of a projectile *1154 found at the crime scene and determined that they were consistent with being fired from the same weapon. Additionally, Colonel Scanlan testified that a positive gunshot residue test did not necessarily mean that- that person fired a weapon. He explained that up to 80 percent of the time homicide shooting victims test positive for gunshot residue because gunpowder is projected at them and, therefore, they no longer test most shooting victims because it is not scientifically |7sound. Colonel Scanlan also explained that gunshot residue goes away very quickly and that washing of the hands would remove it.
Defendant did not call any witnesses at trial.
ASSIGNMENTS OF ERROR
On appeal, Defendant alleges the following assignments of error: 1) there was insufficient evidence to support a conviction for second degree murder; 2) the trial court erred by not suppressing his statement; and 8) the trial court erred by not allowing evidence of the victim’s bad character to be presented to the jury.
LAW AND ANALYSIS

Sufficiency of Evidence

Defendant argues the evidence supported a conviction for manslaughter and not second degree murder. He contends that the physical evidence indicated this was a crime of rage, and three witnesses described him as being very angry prior to the shooting. Defendant asserts that he lost his ability to reason sensibly when confronted with 1) the knowledge that the woman he loved no longer cared about him and was interested in the victim; 2) the physical and mental abuse the victim inflicted on him prior to the shooting; and 3) his run-in with Officer Urrata prior to the shooting.
The State responds that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of second degree murder were proven beyond a reasonable doubt, and the mitigatory factors for a manslaughter verdict were not established by the defense by a preponderance of the evidence. The State argues that Defendant’s actions were inconsistent with an act of manslaughter, noting that Defendant undertook preparatory acts prior to the shooting, and that over an hour passed between the alleged provocation and the shooting.
|sIn reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
In the instant case, Defendant was convicted of second degree murder, which is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1 A(l). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Whether a defendant possessed the requisite intent in a criminal case is a question for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Gonzalez, 07-449 (La.App. 5 Cir. 12/27/07); 975 So.2d 3, 8, writ *1155 denied, 08-0228 (La.9/19/08); 992 So.2d 949.
LSA-R.S. 14:81 delineates two theories of manslaughter: specific intent manslaughter and felony/misdemeanor manslaughter. The jury was instructed as to the first theory. Under LSA-R.S. 14:81 A(l), manslaughter is a first or second degree murder that is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. LSA-R.S. 14:31 A(l).
|9In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove the mitigatory factors by a preponderance of the evidence. State v. Dobbins, 05-342 (La.App. 5 Cir. 12/27/05); 920 So.2d 278, 284. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434 (La.11/28/01); 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lawson, 08-123 (La.App. 5 Cir. 11/12/08); 1 So.3d 516, 523.
The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97); 694 So.2d 1052, 1056.
In the instant case, we find that a rational trier of fact could have found that the evidence was sufficient to support the second degree murder conviction in that the evidence shows Defendant had the specific intent to kill the victim or to inflict great bodily harm upon him. Ms. Sanders testified that she ended her romantic relationship with Defendant, her live-in boyfriend, after which she became involved with the victim. On the night of the incident, Defendant and Ms. Sanders argued, and then Ms. Sanders went outside and got into a car with the victim. Defendant pulled on the door handle and asked Ms. Sanders to exit the car because he wanted to talk to her. The victim pushed Defendant and told him Ms. Sanders did not have to get out of the car. Defendant walked away and said, “I’m a [sic] kill that b*teh.”
| UlWhen Ms. Sanders, the victim, and Ms. Cloud returned from Burger King, Defendant walked toward the car, but Ms. Cloud pulled it to the back of the street and went inside her apartment. Ms. Sanders and the victim sat in the car for 30 minutes, after which they exited the car and talked, hugged, and kissed. Ms. Sanders testified that she heard something in the bushes, after which Defendant suddenly appeared and shot the victim several times. Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. State v. Knight, 09-359 (La.App. 5 Cir. 2/9/10); 34 So.3d 307, 317, writ denied, 10-2444 (La.10/21/11); 73 So.3d 376. The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. State v. Gonzalez, 07-449 (La.App. 5 Cir. *1156 12/27/07); 975 So.2d 3, 8, writ denied, 08-0228 (La.9/19/08); 992 So.2d 949.
Additionally, Defendant admitted he shot at least five times, and that he knew he had hit the victim. The autopsy established that the victim sustained multiple gunshot wounds, with bullet entry points occurring at the back of the victim’s head, the left side of his back, his left arm, and the left side of his abdomen. Specific intent may be inferred from the circumstances and from the defendant’s actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Graves, 99-113 (La.App. 5 Cir. 8/31/99); 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00); 759 So.2d 68.
Further, we find that the mitigatory factors for manslaughter were not established by a preponderance of the evidence. Contrary to Defendant’s assertions, the evidence does not show that the shooting was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive |nan average person of his self-control and cool reflection. Defendant admitted in his statement that after the victim pushed him, he (Defendant) walked away and was thereafter stopped by the police. Afterward, Defendant traveled to another neighborhood to buy marijuana, after which he changed into dark-colored clothes, went back outside, “crept” up on Ms. Sanders and the victim, and shot the victim. He also admitted that Ms. Sanders and the victim did not see him before the shooting, stating, “[A]nd when I came back I, I was coming, uh, through the cut and I saw him and Dominique right there. And they didn’t see me and I just turned the corner and I shot him.” Defendant explained, “And I crept down on them in the cut and I heard them talking or whatever and I just spent the cut on them.” He recounted, “I came back I was walking through the cut and I can hear them like, I can hear them talking and stuff like that. And I just came from behind the gate and just went to shooting.”
The slight pushing of Defendant by the victim more than one hour before the shooting is not sufficient provocation to deprive an average person of his self-control and cool reflection. However, even if the pushing was sufficient provocation, we find that an average person’s blood would have cooled between the time the victim pushed Defendant and the time he shot the victim. Also, Defendant’s statement that he was going to kill Ms. Sanders indicates that Defendant was already contemplating violence more than one hour before the shooting.
On appeal, Defendant argues that he lost his ability to reason sensibly when confronted with the physical and mental abuse the victim inflicted on him prior to the shooting. In his statement, Defendant said he was afraid of the victim; however, he also indicated that he was angry with the victim for getting involved with his girlfriend, Ms. Sanders. Nevertheless, this Court has found that, although | ^our law may extend some limited indulgence to passion justly excited, it does not indulge revenge. State v. Franklin, 11-216 (La.App. 5 Cir. 12/28/11); 87 So.3d 860, 873.
In light of the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient to support the second degree murder conviction, and the mitigatory factors for manslaughter were not established by a preponderance of the evidence.
Therefore, we do not find the trial court erred on this issue.

*1157
Suppression of Statement

Defendant argues that the trial judge erred by denying the motion to suppress his statement. He contends that the statement should have been suppressed because it was the product of inducements (a promise of the possibility of probation), an inability to read, and a lack of understanding. The State responds that the record supports the trial judge’s ruling.
The State has the burden of proving the admissibility of a purported confession or statement by the defendant. LSA-C.Cr.P. art. 708(D). Before an incul-patory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[1] rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises. State v. Franklin, 03-287 (La.App. 5 Cir. 9/16/03); 858 So.2d 68, 70, writ denied, 03-3062 (La.3/12/04); 869 So.2d 817. The admissibility of a confession or statement is a determination for the trial judge and his conclusions on the credibility and weight of the testimony relating to the voluntary nature of the 11sconfession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence. Id.
In reviewing the trial court’s ruling, the evidence presented at trial may be considered in addition to the evidence presented at the hearing on the motion to suppress. State v. Franklin, 03-287, 858 So.2d at 70, citing, State v. Fisher, 97-1133 (La.9/9/98); 720 So.2d 1179, 1182. Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given. State v. Arias-Chavarria, 10-116 (La.App. 5 Cir. 9/28/10); 49 So.3d 426, 433, writ denied, 10-2432 (La.2/25/11); 58 So.3d 460.
At the suppression hearing, Sergeant Michael Cunningham, an 18-year veteran of the Kenner Police Department, testified that on September 3, 2009, he advised Defendant of his constitutional rights using a standard advice of rights form. He explained that he read the rights to Defendant, after which he asked Defendant questions to determine whether Defendant understood his rights and wanted to waive them. Sergeant Cunningham stated that after he asked each question, Defendant checked off his answer as “yes” or “no” and then initialed next to the answer.
A review of the advice of rights form shows that Defendant was advised of his Miranda rights, and that Defendant checked the “yes” boxes and initialed next to each one after being asked if he understood those rights, if he was willing to answer questions at that time without a lawyer, and if he was waiving his rights and agreeing to make a statement. The form also reflects that Defendant checked the “no” box and initialed next to it when asked if any threats or promises had been made to him to induce him to answer questions or give up his rights. The form was signed by Defendant, indicating that he was advised of his rights, understood those rights, and was willing to waive those rights and give a statement.
| uSergeant Cunningham testified that after Defendant signed the form waiving his rights, he gave a recorded statement confessing to the shooting. Sergeant Cunningham further testified that he did not force, coerce, or threaten Defendant in order to obtain his statement, and that *1158 Defendant seemed alert and coherent during the interview. He contended that Defendant was upset and kept saying he was going to go to prison for a long time for “this.” Defendant testified at the suppression hearing that he did not recall either Sergeant Cunningham or Detective Syni-gal asking him if he wanted a lawyer. He explained that the “female detective” told him he could get 40 years to life, and that he could get probation if he started talking. Defendant asserted that the police did not make promises; however, he claimed the police talked about how he would probably get a deal, “like 40 years or probation.” He further claimed that he would not have given a statement if the police had not told him that. Defendant identified his signature and initials on the advice of rights form, but stated that Sergeant Cunningham did not read the form to him and just told him to sign it.
After hearing the testimony, the trial judge denied the motion to suppress the statement, stating:
All right. The court has heard the testimony of the witnesses with regard to the motion to suppress statement. The testimony of Sergeant Cunningham is that he read Miranda rights to the defendant, Brandon Earls; that Brandon Earls initialed by each question and signed the form; that he said he understood his rights and waived those rights.
The Court also heard from Brandon Earls with regard to what occurred that evening. Mr. Earls admitted that he did sign and initial the form. Although he said he could not read, he read from the Rights form during his testimony.
Based upon the testimony of the witnesses, the motion to suppress is denied.
| ^Sergeant Cunningham testified at trial, and his trial testimony regarding the advice of rights and related matters was very similar to his testimony at the suppression hearing. Additionally, Detective Synigal testified at trial, and her testimony corroborated that of Sergeant Cunningham with respect to the matters in question.
After reviewing the testimony from the suppression hearing and trial and the advice of rights form, we find Defendant was advised of his Miranda rights, that he voluntarily and intelligently waived his rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement or promises.
Defendant argues that his waiver of rights was invalid due to his inability to read. However, Sergeant Cunningham testified that he read the rights form to Defendant. Further, when denying the motion, the trial judge noted Defendant read from his rights form during his testimony at the suppression hearing. Defendant also argues that his statement was invalid because it was the product of inducements. However, Sergeant Cunningham testified at the suppression hearing that he did not force, coerce, or threaten Defendant in order to obtain his statement. He also denied that either he or Detective Synigal spoke to Defendant regarding the possibility of him getting probation or a ten to 40-year sentence if Defendant gave a statement. Additionally, Detective Synigal testified at trial that no one used threats or coercion to get Defendant to waive his rights and give a statement, and that no one told Defendant “it would go easy” if he waived his rights and gave a statement.
Therefore, we do not find the trial court erred on this issue.

_Ji¡¡Victim's Bad Character

Defendant argues that the trial judge erred by granting the State’s motion in limine to preclude him from introducing *1159 evidence of the victim’s bad character. He contends that the evidence was relevant to show his state of mind at the time of the shooting, thereby allowing the jury to find that he acted in self-defense. Defendant further contends that the trial judge’s ruling prevented him from presenting his defense. The State responds that this claim should be denied because it has previously been considered and rejected by this Court. It further responds that, even if this claim is considered again, it is without merit.
On January 27, 2011, the State gave the victim’s rap sheet to the defense. On March 16, 2011, the State filed a “Motion in Limine to Preclude the Defendant from Referring to the Victim’s Arrest History.” Defendant subsequently filed a “Memorandum in Support of Motion to Introduce Victim Character Evidence” on April 19, 2011. In his memorandum, Defendant sought to introduce the following evidence: 1) the victim threatened Defendant with a handgun three times prior to the shooting in the instant case, and 2) the victim threatened Defendant with a gun and struck Defendant with his fist just prior to the shooting in the instant case.
Also on April 19, 2011, a hearing was held on the State’s motion in limine, after which the trial judge took the matter under advisement. On April 25, 2011, the trial judge granted the State’s motion in limine to preclude the defense from introducing the bad character evidence of the victim. The trial judge stated that he had reviewed the statements of Defendant, Ms. Sanders, and Bianca and Angie Cloud; the autopsy report; the affidavits of Defendant, and Gregory and Deondra Earls; page 9 of the Kenner Police report; the State’s motion; and Defendant’s memorandum; and that he had heard argument from counsel on April 19 and 25, 2011. The trial judge said that after digesting all of this information, he found that |17the alleged acts brought forth by the defense, whereby the victim allegedly threatened Defendant, did not rise to the level of the overt act as contemplated in LSA-C.E. art. 404.
Defendant filed a writ application with this Court challenging the trial judge’s ruling. This Court denied the writ, finding no error in the trial court’s ruling. State v. Earls, 11-K-596 (La.App. 5 Cir. 6/22/11) (unpublished writ disposition). Defendant subsequently filed another writ application with this Court challenging the trial judge’s ruling. This Court denied the writ, finding that nothing had changed that would warrant it reaching a different conclusion. State v. Earls, 11-K-1054 (La.App. 5 Cir. 11/9/11) (unpublished writ disposition).
Under the discretionary principle of “law of the case,” an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. State v. Junior, 542 So.2d 28, 27 (La.App. 5th Cir.1989), writ denied, 546 So.2d 1212 (La.1989); State v. Burciaga, 05-357 (La.App. 5 Cir. 2/27/06); 924 So.2d 1125, 1128. The principle is applicable to all decisions of an appellate court, not solely those arising from a full appeal. State v. Johnson, 06-859 (La.App. 5 Cir. 4/11/07); 957 So.2d 833, 840. One reason for imposition of the doctrine is the avoidance of indefinite re-litigation of the same issue, but it will not be applied in cases of palpable former error. Id. Reconsideration is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. State v. Davis, 03-488 (La.App. 5 Cir. 11/12/03); 861 So.2d 638, 641, writ denied, 03-3401 (La.4/2/04); 869 So.2d 874.
In the instant case, Defendant has failed to cite to any new facts elicited at trial or *1160 additional jurisprudence which tends to indicate that this Court’s prior disposition was patently erroneous and produced an unjust result. Therefore, we |isfind the law of the case doctrine applicable to this assignment and refuse to reconsider the previous ruling.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). The review reveals no errors patent.
DECREE
For the foregoing reasons, we affirm the second degree murder conviction and sentence for Defendant, Brandon D. Earls.

AFFIRMED

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).