STATE OF LOUISIANA

VERSUS

ROYCE AVERY BURSE

NO. 19-KA-381

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 16,397, DIVISION "C"
HONORABLE J. STERLING SNOWDY, JUDGE PRESIDING


February 12, 2020


**ROBERT A. CHAISSON**
**JUDGE**


Panel composed of Judges Jude G. Gravois,
Robert A. Chaisson, and Hans J. Liljeberg


<u>**AFFIRMED**</u>
    **RAC**
    **JGG**
    **HJL**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Bridget A. Dinvaut
Christopher B. Cortez

COUNSEL FOR DEFENDANT/APPELLANT,
ROYCE AVERY BURSE
Lieu T. Vo Clark

**CHAISSON, J.**

In this appeal, defendant, Royce Avery Burse, challenges the sufficiency of the evidence used to convict him of second degree murder. For the reasons that follow, we affirm defendant's conviction and sentence.

## PROCEDURAL HISTORY

On November 14, 2016, the St. John the Baptist Parish Grand Jury returned an indictment charging defendant with second degree murder, in violation of La. R.S. 14:30.1. At his December 12, 2016 arraignment, defendant pled not guilty. Trial commenced before a twelve-person jury on February 12, 2019, and concluded on February 14, 2019, with a finding of guilty as charged. On March 11, 2019, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant now appeals, challenging the sufficiency of the evidence used to convict him of second degree murder.

## FACTS

This case stems from a shooting that occurred at approximately 9:00 p.m. on September 16, 2016, at an apartment complex located on East Airline Drive in LaPlace, Louisiana. On that evening, in response to 9-1-1 calls of a shooting, Detective Christopher Toups of the St. John the Baptist Parish Sheriff's Office arrived at the scene and observed the female victim, Samantha Griffin, slouched over in an electric wheelchair with a gunshot wound to her left arm.[1] Emergency responders, who had also arrived at the scene, made efforts to resuscitate the unresponsive victim, but they were unsuccessful.[2]

Detective Basil Trepagnier of the St. John Sheriff's Office joined the other officers at the scene of the shooting and began his investigation into the matter.

---

[1] After getting shot, the victim made two 9-1-1 calls, in which she reported that she had been shot and pleaded for help due to blood loss.

[2] The parties stipulated to the findings contained in the coroner's report that identified the cause of the victim's death as blood loss directly related to a gunshot wound to her left arm.

After observing the deceased victim, Detective Trepagnier surveyed her apartment and noticed a receipt book on the victim's bed, which documented the rent monies collected by the victim from the tenants of the apartment complex. Two entries from the receipt book were dated September 16, 2016. One entry was a completed receipt for money paid by Jaylyn Brown,[3] and the final entry in the book was partially filled out with defendant's name and the amount of rent to be paid. In addition to the receipt book, the officers retrieved a spent 7.62 mm shell casing from the victim's apartment.

After completing his investigation inside the apartment, Detective Trepagnier walked outside and observed a black male who was irate because he was denied access to his apartment due to it being encompassed within the crime scene perimeter. According to Detective Trepagnier, this individual, later identified as defendant, eventually calmed down and then inquired as to what had happened and whether the police had found anything inside the victim's apartment. Detective Trepagnier subsequently interviewed defendant, who stated that at the time of the murder, he was at a house in another subdivision in LaPlace but could not provide any specific details.

Subsequent to defendant's interview, and based on information obtained during the course of his investigation, Detective Trepagnier obtained a search warrant for defendant's apartment, which was located near the victim's apartment. Pursuant to the search, a 7.62 mm magazine clip with four 7.62 mm live rounds of ammunition was found in the front porch walkway between defendant's apartment and the victim's apartment. Inside defendant's apartment, the officers discovered blood, two 7.62 mm shell casings that seemed to match the shell casing found in the victim's apartment, a live round of 7.62 mm ammunition, a bag of "green vegetable

---

[3] It is noted that Ms. Brown's first name is spelled several different ways throughout the record. For consistency purposes, her first name will be spelled "Jaylyn" throughout this opinion.

matter," two cellular phones, and some shoes and clothing with what appeared to be blood stains on them. Also, the officers found a machete on the floor in the living room and a t-shirt stuffed inside a hole in the wall. Lastly, the officers located and retrieved a Norenco SKS rifle in an open field behind the apartment complex.

In conducting their investigation into the shooting, the officers talked to numerous individuals, including Jaylyn Brown, who provided them with information about her observations on the night of the shooting. At trial, Ms. Brown, who lived directly across from the victim and defendant, recalled that on the night of the shooting, she went to the victim's apartment to pay her rent and then went back to her apartment. While inside her apartment, she heard banging. Ms. Brown looked out of her window and saw defendant, whom she knew from the apartment complex. Ms. Brown described that defendant was banging on the victim's front door, holding a shotgun. Ms. Brown explained that when the victim did not answer the door, defendant put the gun down "by a lady with a purple truck," walked into his apartment, and then walked back outside wearing a gray, hooded sweatshirt with something wrapped around his hand. According to Ms. Brown, defendant proceeded to bang on the victim's apartment door and then glanced around to see whether anyone was watching. Ms. Brown testified that she pulled her head down out of view from the window because she was scared defendant would see her. At that time, she heard a "big boom." When Ms. Brown exited her apartment a short time later, she could see into the victim's apartment and observed that the victim had been shot.

Ms. Brown further testified that she had seen defendant shoot the same gun into the air the night before the murder; however, when questioned by the police that night, she acted as if she did not know what had happened because she was nervous to identify defendant since he had a gun. At trial, Ms. Brown also explained that when questioned by the police on the night of the murder, she denied seeing

anything out of fear because defendant was at the scene; however, she later gave a statement explaining what she had witnessed. In addition, she identified defendant from a photographic lineup as the person she saw "putting a big gun on side a lady purple truck and knocking on Samantha door."

Jack Crouch, the manager of the apartment complex, also spoke to the police during the investigation and testified at trial. During his testimony, Mr. Crouch explained that the victim collected rent from the tenants for him and also provided him an accounting of the rent owed and paid, as well as notes regarding certain tenants and issues that needed to be resolved. Mr. Crouch provided the officers with the records kept by Ms. Griffin, which contained a note informing Mr. Crouch that defendant owed July and August rent, that he was late on his rent because he "blows his money," and that he still had no electricity and was running an extension cord to Apartment B. The note further commented regarding defendant: "Definitely has to go. He is trouble. He threatened my life twice."

Renee Griffin, the victim's mother, likewise provided the sheriff's office with notes that her daughter had written about defendant. At trial, Ms. Griffin explained that as she was cleaning out her daughter's personal effects from her apartment, she came across notes that she brought to the sheriff's office. Therein, the victim wrote that she called 9-1-1 on defendant on June 26, 2016, because defendant was banging on her door about an extension cord that she had unplugged the day before. According to the notes, the victim hollered to defendant that she was lying down and would "deal with it" when she got up. The notes detailed that defendant continued to bang on the door, called her a b***h, and demanded that she open the door, stating that he was going to knock her out. In her notes, the victim acknowledged that she became angry and thereafter took the extension cord, cut it in half, and threw it out of her door. According to the victim's notes, at that point, defendant informed her he was going to kill her late one night. The notes further advised that

Ms. Griffin called the police, who told her that defendant was not going to bother her and that he was told it was against the law to use someone else's electricity.

In addition to the evidence presented at trial relating to the circumstances of the shooting and the police investigation, the State presented expert testimony. In particular, Patrick Lane, an expert in the field of toolmaker and firearms analysis, testified that the spent casings found inside the victim's and defendant's apartments were fired from the rifle recovered in this case. With regard to the rifle, Elizabeth Hamilton, an expert in DNA analysis, testified that defendant could not be excluded as the major contributor of the DNA on the rifle.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, defendant challenges the sufficiency of the evidence used to convict him of second degree murder.

In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Earls*, 12-448 (La. App. 5 Cir. 12/11/12), 106 So.3d 1149, 1154, *writ denied*, 13-132 (La. 9/20/13), 122 So.3d 1012.

In the present case, defendant was convicted of second degree murder, which is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Whether a defendant possessed the requisite intent in a criminal

case is a question for the trier of fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *State v. Gonzalez*, 07-449 (La. App. 5 Cir. 12/27/07), 975 So.2d 3, 8, *writ denied*, 08-228 (La. 9/19/08), 992 So.2d 949.

Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. *State v. Knight*, 09-359 (La. App. 5 Cir. 2/9/10), 34 So.3d 307, 317, *writ denied*, 10-2444 (La. 10/21/11), 73 So.3d 376. Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. A defendant's act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. *State v. Bonilla*, 15-529 (La. App. 5 Cir. 2/24/16), 186 So.3d 1242, 1253, *writ denied*, 16-567 (La. 5/2/16), 206 So.3d 881, *cert. denied*, -- U.S. --, 137 S.Ct. 239, 196 L.Ed.2d 183 (2016).

In the present case, defendant does not specifically focus on the State's failure to prove the statutory elements of second degree murder. Rather, defendant contends that his second degree murder conviction is deficient because the circumstantial evidence introduced at trial "does not exclude the reasonable hypothesis that this was a manslaughter committed in the heat of passion." He contends that the evidence at trial established that he had a history of conflict with Ms. Griffin, as documented by the notes found in her apartment, which escalated on the night of the shooting.

Manslaughter is defined in La. R.S. 14:31(A)(1) as follows:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually

cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors that may reduce the grade of the offense. *State v. Lawson*, 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 523. In order to be entitled to the lesser verdict of manslaughter, a defendant is required to prove the mitigatory factors by a preponderance of the evidence. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *State v. Earls*, 106 So.3d at 1155.

In the present case, the evidence presented at trial established that the victim, a wheelchair-bound amputee, was found slouched over in her wheelchair with a gunshot wound to her left arm, which resulted in her death. Immediately prior to the shooting, Ms. Brown, who lived directly across from the victim and defendant, saw defendant banging on Ms. Griffin's door while holding a shotgun. According to Ms. Brown, when the victim did not answer the first time, defendant returned to his apartment, retrieved a gray, hooded sweatshirt, and then went back to the victim's apartment where he continued to bang on the victim's front door and glance around to see if anyone was watching. Fearful, Ms. Brown ducked out of sight, at which time a gunshot was heard. Ms. Brown exited her apartment a short time later and discovered the victim had been shot.

The State also introduced evidence that a receipt book was found in the victim's apartment, which contained a receipt, dated September 16, 2016, that was partially filled out with defendant's name and rent payment information. In

addition, the State presented evidence that the spent casings found inside the victim's and defendant's apartments were fired from the rifle recovered behind the apartment complex and that this rifle contained defendant's DNA.  Further, the State offered Ms. Brown's testimony that she had observed defendant with the same gun the night before the murder when he fired it into the air for no known reason.

At trial, the State also introduced evidence that showed that defendant had previously threatened to kill the victim.  In particular, in the note the victim provided to the manager of the apartment complex, she wrote that defendant threatened her life twice.  Also, approximately three months prior to the murder, the victim made notes, which were found in her apartment after her death, about defendant's erratic behavior.  The victim detailed that defendant had called her names and threatened to injure her if she did not return his extension cord, which he was illegally running between apartments.  In the notes, the victim recalled that she cut the extension cord in half and threw it outside her apartment, prompting defendant to respond that he was going to kill her late one night.

Based on the foregoing, we find that the evidence presented at trial was constitutionally sufficient to support the jury's finding that defendant had the specific intent to kill or inflict great bodily harm on Ms. Griffin.  Further, we find that the mitigatory factors of sudden passion and heat of blood were not established by a preponderance of the evidence.  At trial, no evidence was presented to suggest that defendant and the victim had any altercation and/or interaction sufficient to deprive an average person of his self-control and cool reflection on the night of the shooting.  Any alleged conflict between the victim and defendant occurred months before the murder.  Further, an argument alone does not constitute sufficient provocation to reduce murder to manslaughter.  *State v. Bonilla*, 186 So.3d at 1253.

Thus, we find that a rational trier of fact could have found that the evidence was sufficient to support defendant's second degree murder conviction and that the

mitigatory factors for manslaughter were not established by a preponderance of the evidence.

## ERRORS PATENT REVIEW

Lastly, we have reviewed the records for errors patent in accordance with La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). Our review reveals no errors patent in this case.

Accordingly, for the reasons set forth herein, we affirm defendant's conviction and sentence for second degree murder.

## AFFIRMED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**FEBRUARY 12, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

**19-KA-381**

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE J. STERLING SNOWDY (DISTRICT JUDGE)
HONORABLE BRIDGET A. DINVAUT          CHRISTOPHER B. CORTEZ (APPELLEE)          LIEU T. VO CLARK (APPELLANT)
(APPELLEE)

**MAILED**
NO ATTORNEYS WERE MAILED