MICHAEL E. KIRBY, Judge.
On April 5, 2001, the defendant-appellant Vincent Cheavious was indicted for the first-degree murder of Charlotte Cheavious wherein he had the specific intent to kill or inflict great bodily harm' on more than one person. The defendant entered a dual plea of not guilty and not guilty by reason of insanity at his arraignment on April 10, 2001. The court immediately ordered a lunacy hearing, which was conducted on May 8, 2001. After two doctors testified, the court found the defendant competent to proceed. On September 21, 2001 the State amended the indictment to reflect that the defendant violated La. R.S. 14:30.1 relative to the second degree murder of Charlotte Cheavious and added as a second count a violation of La. R.S. 14:27(30.1) relative to the attempted second degree murder of AIhe Robinson.[1] The court held additional lunacy hearings, including one just prior to trial, at which time the court again found the defendant competent to proceed. A two-day jury trial followed. After the State had rested its case, the defendant withdrew his dual plea and entered a simple not guilty plea, then rested without presenting any witnesses. The twelve-person jury returned a verdict of guilty as charged on count one and guilty of the responsive verdict of aggravated battery as to count two. On September 9, 2002, the court denied the defendant’s post-verdict motions. The defendant waived delays, and the court sentenced him to life imprisonment without the benefit of probation, parole, or suspension of sentence on count one and to ten years at hard labor on count two. The sentences were ordered to run concurrently. This appeal in which the defendant raises a single assignment of error follows. -
The testimony at the trial established that the defendant and the victim, his wife Charlotte, had separated a few months before Charlotte’s death on February 2, 2001. Charlotte lived in one-half of a dou *137 ble residence with her two children, S.R., age eight, and V.R., an infant who was the child of the defendant and the victim. Charlotte’s mother, Allie Robinson, lived in the other half of the double. On the day of her death, Charlotte picked up her older child from a friend’s house. She had also picked her mother up from work and ran various errands. Charlotte, Mrs. Robinson, and S.R. returned home without the baby, who had apparently been removed from the babysitter’s care without her mother’s permission. Both Mrs. Robinson and S.R. testified that the victim placed various phone calls in an attempt to get her child back, telling at least one person that she was going to call the police, which she did.
Officer Gary Barnes responded to the victim’s call, which came to him as a “103, a disturbance concerning child custody between a wife and husband.” Officer Barnes met with the victim who explained to him that, without her permission, her husband had removed their fourteen-month old daughter from the babysitter and she wanted the child returned home.[2] The victim further explained to Officer Barnes that she had tried to call the number where she believed the defendant was, but that her calls were not being accepted. Officer Barnes placed a call and spoke with a female to whom he explained why he was calling and asked for the defendant to contact him; this woman told the officer that the child was at the home of the defendant’s sister. A short time later a male called Officer Barnes; the officer told the caller that he was looking for Vincent Cheavious at which point the phone went dead. Officer Barnes concluded his investigation by explaining to the victim that, as there was no apparent harm to the child, no history of violence towards the child, and Vincent Cheavious was thé biological father, there was no further police action to take and her recourse was through the civil court. Officer Barnes confirmed this analysis of the situation with his supervisor. He then concluded his paperwork and left the scene, but only went a short distance before he made an unrelated vehicle stop. As he was doing the traffic stop, approximately five minutes after he had left the victim’s home, a dispatch came through of a shooting at the residence. Officer Barnes returned, went to the front door, and saw Charlotte Cheavious on the floor bleeding. He called for an EMS unit and secured the scene. EMS personnel declared the victim dead.
S.R. was a witness to her mother’s murder. She testified at the trial that, approximately five minutes after the police officer left, the defendant knocked on the door. The victim let him in, asking him where her baby was. The defendant did not respond, but instead removed a gun from his pocket and pointed it at the victim’s neck. S.R. closed her eyes and heard three gunshots. When she opened her eyes, she saw her mother on the floor and so she ran next door to get her grandmother.
Mrs. Robinson testified that, after the police officer left her daughter’s residence, she returned to her side of the double house and went upstairs to shower. She then heard three loud noises, which did not sound right, coming from her daughter’s side of the double. Mrs. Robinson ran outside and saw the defendant outside standing by a bush. The defendant fired towards her, and she fell back inside her house to make the defendant think he had shot her, and then pushed the door shut. Within two or three minutes, S.R. banged on the door. Mrs. Robinson opened her door and saw the defendant running down *138 the street. She returned to her daughter’s house and saw her on the floor. Mrs. Robinson called 911.
Dr. James Traylor performed the autopsy on the victim. He found evidence of three separate gunshot wounds. One bullet had entered into the chin, came out the other side, and then entered the neck, ultimately perforating the lung. A second wound was just underneath the left earlobe; the bullet had lacerated the left carotid artery, causing massive bleeding in the neck, before exiting the back. Another bullet had entered behind the left ear, penetrating the skull and causing massive injuries to the brain before lodging in the neck. Dr. Traylor was unable to locate any defensive wounds on the victim. He stated that the shots were fired from six to eighteen inches away based upon the stippling and tattooing around the wounds. He further testified that two of the three wounds were such that the victim, upon sustaining either one, would have dropped “like a sack of potatoes” and been unable to engage in any struggle.
Darlene Causey testified that she had been a good Mend of the defendant for a couple of months prior to the shooting of Charlotte Cheavious. Around the end of January 2001, Darlene was with the defendant when he attempted to purchase a gun. The defendant was told that he would not be able to have the gun until the background check was complete, which might take up to three days. During this time, the defendant told Ms. Causey many times that he was going to kill his wife because she was not taking care of his child correctly. However, Ms. Causey stated that on at least one occasion she had bathed the baby and saw no evidence of mistreatment.
On the day after the defendant had made arrangements to purchase a gun, he had some type of argument with Ms. Cau-sey’s son; she told him not to come around any more. However, on the following day, the defendant came to her house with his baby and left the child overnight in Ms. Causey’s care. That morning she went to get her hair done. During the day, her son called and said that the defendant had taken her car. That evening, the defendant called Ms. Causey and said he had killed “that bitch” and now his child would be safe. Ms. Causey testified at trial that, on the same evening, when she returned home she heard a message on her answer machine from the defendant’s wife. The message was, “Vincent, you unchemical m-f_, bring me my daughter.” Ms. Causey admitted that she never actually saw the defendant in possession of a gun.
Sergeant Fred Bates testified that he was the homicide detective who handled the investigation of the murder of Charlotte Cheavious. He testified that he directed the handling of the scene, which included having photographs taken of the victim’s home. He noted that much of the upstairs was in disarray with clothing scattered on the floor and drawers pulled out of a dresser, but he was unable to link this disarray with the crime. The downstairs of the home showed nothing out of the ordinary except that a television set in the dining area appeared to have been moved. Sergeant Bates also noted that in the kitchen, there were several Wal-Mart bags, which made it appear that the victim had recently been shopping.
Sergeant Bates further testified that he interviewed the victim’s mother and daughter and developed the defendant as a suspect. He applied for and obtained a warrant for the defendant’s arrest. At approximately 1:00 a.m., the murder having occurred at 7:48 p.m. the preceding evening, Sergeant Bates was notified that a call had come in from DePaul’s Hospital *139 stating that the person wanted for the murder of Charlotte Cheavious was at the hospital attempting to cheek himself in.
The defendant was arrested at DePaul Hospital by Officer Chad Perez of the Second District who had responded with his partner to the call that a person wanted for murder was there. Officer Perez testified at trial that the defendant was on the pay phone in the lobby when he arrived. The defendant was very calm and did not attempt to flee. He confirmed for the officers that he was wanted for a murder that had occurred earlier.
Despite police attempts to locate the murder weapon, it was never found.
The defense rested without presenting any witnesses.
In his sole assignment of error, the defendant argues that the jury verdict of guilty of second-degree murder should be reversed because there was sufficient proof of mitigating factors that support a responsive verdict of manslaughter. The defendant suggests that the victim’s threats to call the police made him fear that his child would be left defenseless with a person who was not caring properly for her, and thus caused him, as it would the average person, to lose his self-control and cool reflection.
Manslaughter is defined in pertinent part by La. R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; ...
The Louisiana Supreme Court has explained the relationship between the two separate offenses of homicide and manslaughter as follows:
It is the presence of “sudden passion” and “heat of blood” that distinguishes manslaughter from murder. This court has repeatedly stated, however, that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide' is committed in the absence of these factors. State v. Lombard, 486 So.2d 106 (La.1986); State v. Tompkins, 403 So.2d 644 (La.1981). Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” is entitled to a verdict of manslaughter. Lombard, 486 So.2d at 111.
State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838.
“Heat of blood” or “sudden passion” is defined by the jurisprudence as provocation sufficient to deprive an average person of his self-control and cool reflection. State v. Robinson, 2001-1305, p. 11 (La.App. 4 Cir. 4/17/02), 820 So.2d 571, 579, writ denied, 2002-1640 (La.5/30/03), 845 So.2d 1068. However, such provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled or that an average person’s blood would have cooled at the time the offense was committed. State v. Collor, 99-0175, p. 10 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 102. When reviewing the contention, as made by defendant in the instant case, that evidence was produced that the offender committed the crime in sudden passion or heat of *140 blood, the Jackson v. Virginia[3] standard of review must be employed to determine whether a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. Snyder, 98-1078 at pp. 4-5, 750 So.2d at 838. The defendant need not affirmatively establish the factors; the jury is free to infer the mitigating circumstances from the evidence. State v. Lindsey, 98-1064, p. 5 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, 547.
The defendant’s argument hinges on the evidence that he learned only a few minutes before the shooting that Charlotte Cheavious had in fact called the police. However, while this may have pushed the defendant over the edge in terms of wanting to kill his wife, Darlene Causey’s testimony showed that, three days earlier, the defendant had taken steps to procure a weapon for the express purpose of killing his wife. Even if his motivation at that time was some misguided belief that his child was at risk, an average person certainly would have time over a three-day period to consider more rational ways to deal with a child welfare issue than killing the child’s other parent. The average person presumably could have done exactly what Charlotte Cheavious did, call the police. In any event, if the defendant was motivated by concern for his child, he had already removed the child from the physical custody of her mother. An average person would certainly have had time in the day following the removal of the child to consider more reasonable solutions to the custody problem than murder.
Furthermore, there was absolutely no evidence in this case that the defendant’s child was at risk or ill-treated. Ms. Cau-sey testified that the child appeared well cared for. Although the baby had been left with a sitter for a couple of days, Mrs. Robinson testified that the person babysitting was her older daughter, the baby’s aunt. Mrs. Robinson further testified that Charlotte worked as a bus driver for RTA and attended Southern University. She stated that the reason the baby had been staying with her aunt for a couple of days was because Charlotte “had been working around the clock.” Thus, the State rebutted any suggestion that Charlotte Cheavious had mistreated or abandoned her child. The State through Ms. Causey’s testimony further established that the defendant planned for at least three days to kill his wife.
The defendant’s assignment of error has no merit.
Although not argued by the defendant in his assignment of error,[4] a review of the entire record for errors patent reveals that the conviction on the second count is not supported by the evidence. In this count, the defendant was charged with the attempted second degree murder of Allie Robinson, a violation of La. R.S. 14:27(30.1). The jury returned a verdict of guilty of aggravated battery, a responsive verdict under La.C.Cr.P. art. 814.[5] Aggravated battery is defined in La. R.S. 14:34 as a battery committed with a dangerous weapon. La. R.S. 14:33 defines a battery *141 as “the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid substance to another.” In contrast to battery, an aggravated assault is the attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery with a dangerous weapon. La. R.S. 14:36; La. R.S. 14:37.
Here, there was no evidence presented by the State to show that Mrs. Robinson was actually shot by the defendant or that there was any force or violence inflicted upon her person. Instead, she stated that the defendant shot in her direction; she went inside and fell down as if she were shot so that the defendant would believe she was; she did not testify that she was actually struck by the bullet. She did not testify regarding any wounds or injuries she suffered.[6] No other evidence was presented to indicate that she was struck by the shot that the defendant fired in her direction. Thus, the evidence presented at trial reflects the defendant certainly committed an aggravated assault upon Mrs. Robinson, but not an aggravated battery.
Aggravated assault is not a responsive verdict to attempted murder or attempted manslaughter. State v. Whins, 96-0699 (La.App. 4 Cir. 4/9/97), 692 So.2d 1350; La.C.Cr.P. art. 814. In Whins, the defendant was charged with four counts of attempted first-degree murder and one count of aggravated burglary. A jury found him guilty as charged on one count of attempted murder, guilty of attempted manslaughter on the three remaining counts of attempted murder, and guilty as charged of the burglary. The trial court subsequently granted the defendant’s motion for post verdict judgment of acquittal on the first four counts. In considering the State’s appeal from the granting of the post verdict motion of acquittal, this Court noted that to sustain the convictions for attempted first degree murder and attempted manslaughter, the State was required to prove beyond a reasonable doubt that the defendant had the specific intent to kill and the commission of an overt act toward that goal, citing State v. Bordenave, 93-1682 (La.App. 4 Cir. 8/23/95), 660 So.2d 1207. Whins, p. 3, 692 So.2d at 1353. The evidence in Whins showed that the defendant fired shots into the windows of the mobile home, where his ex-girlfriend, her father, and two children were present, when his ex-girlfriend refused to come out. However, no one was near the windows, the shotgun pellets lodged upward, and no one inside was struck. The defendant finally was able to climb inside, found his girlfriend, put the gun to her head, and threatened to shoot her and the children. However, he never shot them and was apprehended outside when the police arrived. Evidence later showed that each time he fired the shotgun, the defendant had to load it; the shotgun was empty when he put it to his girlfriend’s head, and he was not in possession of any more shells. Thus, this Court agreed with the trial court that, taking all of the evidence in the light most favorable to the prosecution, the State had not excluded the reasonable hypothesis that the defendant had fired at the trailer only in an attempt to force his ex-girlfriend to exit, and thus the attempted first degree murder based on the aggravating factor of the intent to kill more than one person was not supportable. Furthermore, the defendant could not have intended to kill his girlfriend when he held the gun to her head because he knew it was not loaded *142 and he had no means to reload it. Thus, the defendant was guilty only of multiple aggravated assaults, which verdicts are- not legislatively responsive, and the trial court acted correctly when it granted the post verdict, judgment of acquittal.
Taking the evidence in the light most favorable' to the prosecution, the record fails to establish that the State proved an aggravated battery was committed upon Allie Robinson. We note that the defendant apparently did not object to inclusion of aggravated battery as a verdict, and that La.C.Cr.P. art. 814(C) specifically provides that such an objection can be made at the conclusion after all evidence has been submitted. The failure to object will bar relief regarding the sufficiency of the evidence but only if the evidence is sufficient to sustain the greater offense which was charged in the indictment. See State v. Camp, 571 So.2d 195, 200 (La.App. 4 Cir.1990), citing State v. Schrader, 518 So.2d 1024 (La.1988). In those cases, the defendants were charged with murder and convicted of manslaughter. The court in Schrader noted' “absent a contemporary objection, a defendant may not complain if jurors return with a legislatively approved responsive verdict, whether or not that verdict is supported by the evidence. This Court has indicated that such a result both recognizes the legitimacy of a ‘compromise’ verdict and comports with the responsive verdict scheme of La.C.Cr.P. art. 814. State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982). However, and as Elaire made clear, there is an important proviso to this rule: the evidence must be sufficient to sustain a conviction on the charged offense. Id at 251.” Schrader at 1034.
Here, the jury rejected the possible verdicts of guilty of attempted second-degree murder and attempted manslaughter as to Mrs. Robinson, but there is no indication that the verdict of guilty of aggravated battery was a compromise as the jury found the defendant guilty as charged on the murder count. Furthermore, the jury’s apparent rejection of a finding that the defendant had a specific intent to kill Mrs. Robinson appears reasonable in light of the lack of evidence of intent to kill her. The defendant had not attempted to kill the actual witness to the murder, the victim’s eight-year old daughter. He fired only once in the direction of Mrs. Robinson, from some distance away, and did not pursue her when she threw herself inside the door of her home. Furthermore, if Mrs. Robinson had been struck by the bullet, the verdict of guilty of aggravated battery would have been valid. It is only the lack of evidence of any actual physical contact with Mrs. Robinson that prevented a valid verdict of guilty of aggravated battery. Cf. State v. Hawkins, 93-1260 (La.App. 4 Cir. 1/27/94), 631 So.2d 1288.
Therefore, the defendant’s conviction and sentence on count two are vacated. His conviction and sentence on count one are affirmed.
CONVICTION AND SENTENCE ON COUNT ONE AFFIRMED; CONVICTION AND SENTENCE ON COUNT TWO VACATED.

. Throughout the trial transcript Mrs. Robinson’s first name is spelled "Ali” instead of “Allie” as shown in the amended indictment.

. The babysitter did not testify at trial.

. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. By order dated September 12, 2003, this Court ordered the parties to file additional briefs on the issue of the sufficiency of the evidence for the defendant's conviction on count two of the indictment. The defense attorney filed a supplemental brief within the deadline set by this Court, but the district attorney’s office did not.

. The responsive verdicts to attempted second degree murder are guilty, guilty of attempted manslaughter, guilty of aggravated battery, and not guilty. La.C.Cr.P. art. 814(A)(4).

. Additionally, the preliminary hearing transcript contained in the appellate record reflects that Sergeant Fred Bates was questioned regarding the shot fired at Mrs. Robinson, and he stated that she was not struck by the shot.