STATE OF LOUISIANA

VERSUS

CHARLES ROSS

NO. 24-KA-102

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-625, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING

December 18, 2024

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Scott U. Schlegel

**AFFIRMED**
    **MEJ**
    **SMC**
    **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Juliet L. Clark

COUNSEL FOR DEFENDANT/APPELLANT,
CHARLES ROSS
Lieu T. Vo Clark

**JOHNSON, J.**

Defendant, Charles Ross, seeks review of the 24th Judicial District Court's judgments convicting him of first degree murder and sentencing him to life imprisonment. For the following reasons, Defendant's convictions and sentences are affirmed.

## FACTS AND PROCEDURAL HISTORY

On February 10, 2022, a Jefferson Parish Grand Jury indicted Defendant on charges of first degree murder of Nygia Lambert in violation of La. R.S. 14:30(C)(2)[1] (count one) and obstruction of justice in violation of La. R.S. 14:130.1 (count two). Defendant pled not guilty to both charges at arraignment.

Defendant's counsel filed three pre-trial motions, including a Motion to Enter a Plea of Not Guilty by Reason of Insanity & Motion for Mental Examination. The district court ordered that a plea of not guilty by reason of insanity be entered on behalf of defendant. The order also appointed an independent forensic psychiatrist to examine Defendant and testify as a mental health expert relating to any mental disease, defect, automatism, unconsciousness, intoxication, or other condition of Defendant bearing upon the issue of whether he had the mental capacity to commit the alleged crimes at the time of their alleged commission. The March 22, 2023 minute entry reflects the court "ordered the Sanity Commission to evaluate the Defendant via zoom while he is incarcerated in EBRPP." Defendant's subsequent counsel filed a "Notice of Withdrawal of Previous Counsel's 'Motion to Enter a Plea of Not Guilty by Reason of Insanity.'"

Before trial on October 31, 2023, the State indicated that Defendant needed to change his plea on the record. Defense counsel conferred with Defendant

---

[1] This subsection of the first degree murder statute specifically indicates that the district attorney does not seek a capital verdict. The State also filed a State's Notice of Election to Forego Capital Punishment.

regarding the issue. The judge acknowledged that previous counsel had entered a "dual plea of not guilty by reason of insanity and not guilty." The judge then asked if the defense now wished to withdraw that plea. Defense counsel confirmed and explained that he had filed a notice the prior evening to withdraw the plea of not guilty by reason of insanity. The court acknowledged the withdrawal, and defense counsel confirmed that Defendant was proceeding with a sole not guilty plea. Afterwards, a twelve-person jury was selected.

The following facts were adduced at trial.

Defendant, Charles Ross, and Nygia Lambert met via an online dating website and began a long-distance relationship in 2020. Ms. Lambert eventually moved to Metairie, Louisiana, after staying with Defendant for a few months in Baton Rouge. The week before Defendant killed Ms. Lambert, the couple spent time in Baton Rouge looking at apartments. On June 2, 2021, Ms. Lambert told Defendant over the phone that their relationship was over and that she wanted no further contact or communication with him. Ms. Lambert stopped answering his calls and responding to his messages, and blocked him on social media.

Defendant continued to attempt to reach Ms. Lambert via phone and text messages. Deputy Michael Dow with the Jefferson Parish Sheriff's Office ("JPSO") responded to a harassment call at an apartment complex located at 120 Houma Boulevard in Metairie. Deputy Dow testified that Ms. Lambert advised that her ex-boyfriend, Defendant, was threatening her, but denied that he threatened to cause her bodily harm and refused to show the deputy her phone. She stated that he threatened to withdraw financial assistance and that he had twisted her wrist in the past. But, she did not press charges. Deputy Dow stated that he put in a patrol request for that evening and provided Defendant's demographics as a precautionary measure. Another deputy called Defendant, but he did not answer.

Ms. Lambert texted Defendant to let him know that she contacted the police to complain about his behavior and harassment.

On the morning of June 3, 2021, Deputy Nathan Rome of JPSO was the first officer on the scene of the shooting that occurred at the victim's apartment on Houma Boulevard. He walked into a bedroom with a closed bathroom door. As he opened the bathroom door, he found Ms. Lambert's daughter crying hysterically. She told Deputy Rome that her mother was under the bed and that "Mr. Ross shot [her] mom." Deputy Rome lifted the bed and found Ms. Lambert underneath, with no clothing on and multiple gunshot wounds. The police pulled her out and began CPR, as he thought she still had a pulse. EMS arrived thereafter to continue to provide medical care, but eventually pronounced Ms. Lambert dead on the scene.

Former JPSO Detective Steven Quaintance identified Defendant as a suspect after he responded to the scene at 120 Houma Boulevard, Apartment 16 in Metairie and spoke with Deputy Dow, and with the victim's daughter and son-in-law. Detective Quaintance testified that the Louisiana State Police's Fugitive Apprehension Unit was contacted because investigators believed Defendant was in Baton Rouge. Louisiana State Police detained Defendant in Baton Rouge later that day and found him in possession of what was confirmed to be the murder weapon and two cell phones; one of which Defendant admitted belonged to the owner of a stolen GMC Sierra Truck. Detective Quaintance obtained surveillance video from the apartment complex and a nearby daiquiri shop. He explained that the surveillance footage showed the stolen GMC truck parked in the daiquiri shop's parking lot, and Defendant entering the breezeway of Ms. Lambert's apartment complex at 2:58 a.m. on June 3, 2021. The footage showed the bottom of Defendant's feet as he kicked in the door of the victim's apartment before entering, and then leaving a minute and a half later with something under his arm, presumed

to be the firearm. Defendant covered his face as he fled the scene. From another camera angle, which showed the corner of Lenora and Houma, the GMC Sierra could be seen passing by the apartment complex at 2:49 a.m. before parking at the daiquiri shop to conceal the license plate. Defendant is also seen walking towards Houma Boulevard at 2:50 a.m. and returning to the vehicle at 3:03 a.m.. Detective Quaintance confirmed that Defendant, when apprehended, was wearing the same clothing he had on in the surveillance footage.

Detective Quaintance testified that he obtained an arrest warrant for Defendant. The detective read Defendant his *Miranda* rights and took an audiovisual recorded statement from Defendant, which the jury viewed.

Baton Rouge Sheriff's Office ("BRSO") Deputy Charles Mock testified that he responded to a carjacking at Jayla Food Mart on June 2, 2021 around 11:40 p.m. The victim advised that his green 2001 GMC Sierra pickup truck had been taken. Deputy Mock issued an all-points bulletin for the vehicle.

Lieutenant Glen LeBlanc, a Uniform Patrol shift supervisor with the East Baton Rouge Parish Sheriff's Office, was *en route* to the scene of the crime when he observed a vehicle at the intersection of Burbank and Highland Road in Baton Rouge that matched the description given by Deputy Mock. He turned to follow the vehicle, confirmed through dispatch that it was the stolen truck, and waited for backup. Once Lieutenant LeBlanc received confirmation and backup, he activated his lights and sirens, but the truck sped up. The vehicle approached speeds close to 70 mph and did not stop as the lieutenant called out the pursuit. Lieutenant LeBlanc ended the pursuit for safety reasons after the vehicle made a sharp left off Burbank and continued to pull away, although the officer was traveling at 60 mph.

JPSO Detective Anthony Buttone acted as a scene investigator on this case. At trial, he described the evidence he found and identified photographs depicting the exterior of Ms. Lambert's second-floor apartment, the surveillance camera near

the stair landing, damage to the entrance door to the apartment, and the scene in the bedroom where a mattress was standing upright. Detective Buttone also observed two holes in the mattress at the scene, two projectile strikes to the bottom of the door, and blood and two fired cartridge cases on the bedroom floor. All of the fired cartridge casings found near her body, including the one found underneath her and one on the bedsheet, were 9 mm. A cell phone was also collected as evidence from the scene.

Forensic pathologist Dr. Dana Troxclair testified that she conducted the autopsy on the victim and found eight gunshot wounds. She described the fatal gunshot wounds, explaining that one bullet traversed the right kidney, lumbar vertebra L1, abdominal aorta, and left kidney, moving from the right side of her body to the left side, and other bullets entered her right breast and lower right chest. Dr. Troxclair also noted that the victim sustained three gunshot wounds to her hands – two on the left hand and one on the right. Dr. Troxclair stated that the stippling on her left hand indicated the victim had her hand raised – a defensive stance – as the gun was fired. Dr. Troxclair concluded that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide.

Trooper Chase Huval of the Louisiana State Police Fugitive Task Force testified that, on the morning of June 3, 2021, he received a call about the search for Defendant in Baton Rouge. He encountered Defendant on foot in an abandoned apartment complex, placed him under arrest, and advised him of his rights. Trooper Huval testified that Defendant did not resist arrest and followed commands. During a pat-down for officer safety, the trooper found a Smith & Wesson pistol with one magazine and eight rounds of 9 mm live cartridges in Defendant's front waistband. Officer Huval recovered the keys to the stolen GMC Sierra truck, which was subsequently seized and towed, from Defendant's pockets. He testified that Defendant attempted to make statements. But, he repeatedly stopped Defendant.

After reading Defendant his *Miranda* rights, which he understood and waived, Defendant continued speaking. Trooper Huval indicated that Defendant did not appear intoxicated, described him as "pretty relaxed", and explained to Defendant that a detective would speak to him.

Deputy Jene Rauch, previously of the JPSO Crime Lab, was accepted as an expert in firearms and tool-mark identification. She examined several specimens from the crime scene and identified seven fired cartridge casings and a copper fragment that she was able to determine were fired from the Smith & Wesson pistol Officer Huval seized from Defendant. Of the three ballistic items recovered during the autopsy, only one could be determined to be from the gun. Additionally, one additional jacket fragment recovered from the doorway was too badly damaged to confirm that it was fired from the same gun.

The trial court accepted Detective Dustin Ducote from the JPSO digital forensics unit as an expert in the field of mobile device analysis. He examined Defendant's phone, the victim's phone, and a Google return. The detective explained that an extraction from Defendant's phone, a Samsung Galaxy S8, revealed multiple communications to Ms. Lambert's number, 504-***-3945[2], and messages sent to another individual's number, 225-***-5737[3], on June 2, 2021. In summary, the detective testified that at 1:26 p.m., a call was placed, and text messages were sent to Ms. Lambert's number ***-3945. Defendant texted, "Must I come there…???" followed by, "Your [sic] feeling weak as in go to the hospital." After an eight-second phone call at 1:34 p.m., he sent another message stating, "If you don't let me know I'm coming on my own." The detective mentioned Defendant's repeated calls and texts pleading with Ms. Lambert to reply so he does

---

[2] Out of an abundance of caution, the number is redacted. *See State v. Murray*, 17-534 (La. App. 5 Cir. 3/14/18) 242 So.3d 821, 825 n.3.

[3] During Defendant's later testimony, he explained that his childhood friend called and texted him. It appears this is the individual with the 225-***-5737 number.

not have to pay someone to bring him to Metairie, such as "I'm not really trying to waste money and come there could you reply?" At 2:47 p.m., Ms. Lambert responded, "Thanks for your concerns, I'm okay," and added a minute later, "It's time to submit to PAPA and allow His will to be done." Six minutes later, Defendant responded, "I understand just answer your phone, consider my feelings". There was a 10 minute, 56 second phone call from his phone to Ms. Lambert's phone after that.

Detective Ducote testified that Defendant continued sending texts like, "Okay you toying with my feelings," and he sent multiple messages, including, "I stayed getting my a** --kicked in my a**," and "I'm so tired, I'm so tired, I'm so tired."

Detective Ducote also discussed text messages sent between Defendant's phone and the number *** -5737. An incoming text from that number asked, "Hey bro what time you get off?" At 3:32[4] p.m., Defendant responded, "At 5 sis...nygia got me ready to just f*ck her up." He followed up with, "she play and toying with my feelings 4 real," and "I'm tired of trying and keep getting kicked in my a**." The ***-5737 number replied, "Ok ok just calm down bro," and at 3:33 p.m., Defendant texted, "I'm be the last one she confused about." He also sent, "She obviously not ready to be in a relationship," and "I'm f*ck this girl up." At 3:34 p.m., he added, "I'm tired of sick fake a** females playing with me and giving me all and I'm just pose to do."

Detective Ducote testified that throughout the afternoon, Defendant continued to call Ms. Lambert's number and sent more messages to the ***-5737 number. At 3:41 p.m., Defendant texted to the ***-5737 number, "She's gonna learn THE BIGGEST LESSON OF HER LIFE." He sent another at 3:42 p.m., stating, "I'm bout to leave work sis f*ck this job, she gone learn the hard way," and

---

[4] The trial transcript reads "9:32." It appears to be a typographical error.

he added, "Love you." In response, the other number replied, "I Love You too!! However I just need you to take a minute & see how Satan is tryna set you up right now." That same number also texted, "Don't listen to Those voices bro…don't listen to ur emotions." There were three incoming calls to Defendant's phone from a different number at 4:02 p.m. Defendant stopped calling Ms. Lambert at that point, but sent a text at 7:03 p.m. to ***-5737, saying, "Please forgive me for my future actions tell law the same thing…I love [you] and gonna miss yall so much."

Detective Ducote testified that he also analyzed Defendant's Google return, which logged all of Defendant's activity on Google or through his G-mail account. Defendant's e-mail address was identified as "charlesross1976@gmail.com." He explained that an e-mail was sent to Ms. Lambert's account at "nygiar155@gmail.com," stating, "You changed your number, your such a liar and a selfish female, your lowdown because you . . . treated so lowdown but guess . . . guess wht f*ck that job I've made my decision…you be safe." Detective Ducote further testified that Defendant sent numerous e-mails to Ms. Lambert after 4:00 p.m., including messages referencing her calls to the police, old photographs of her, and one that included a coffin and a scales of justice emoji. Defendant also sent an old voicemail and several more photos throughout the day. His Google activity further revealed searches for "120 Houma Boulevard, Metairie, Louisiana," and "732 General Claiborne, Baton Rouge, Louisiana," with his account linked to Google Maps on his phone.

Rita Ross, Defendant's sister, and Carlissa Mealey, his niece, testified after the State rested. She explained that her brother seemed happy with Ms. Lambert and he expressed a desire for a new life, and confirmed that he bought a ring for Ms. Lambert. Ms. Ross thought that Defendant appeared distraught, lost, and confused after his arrest. Ms. Mealey agreed that he looked lost and said that she did not recognize him right away because he looked "out of it".

Last, Defendant took the stand. He discussed his criminal record and history of drug abuse. A judge had previously ordered him to attend rehab. He remembered meeting Ms. Lambert through a dating website and traveling to see her in Atlanta after three weeks of exchanging messages and frequently FaceTiming each other. He visited her apartment which he thought was sparsely furnished. He thought that she might need financial help. He explained that he spent over two thousand dollars on a venture that involved selling "living insurance" because Ms. Lambert wanted to pursue that opportunity, even though he wanted to obtain his CDL and start a trucking company.

Defendant testified that in late May 2021, he left Ms. Lambert's apartment after a small argument caused by a mailman calling her phone and a conversation about her landlord questioning her living arrangements. To prevent an eviction, Defendant decided to reside in Baton Rouge and found a job detailing vehicles across the street from his mother's house. Ms. Lambert went to visit him in Baton Rouge and brought him some of his belongings. They discussed his new job and went apartment hunting.

On June 2, 2021, Defendant went to work. The day before, he played Spades on Facebook and FaceTimed with Ms. Lambert from his mother's home in Baton Rouge. When he tried to contact Ms. Lambert on FaceTime at work, she was not feeling well and the conversation was brief. When he tried to reach her by phone and text, he received no response. During a call, she told him she wished to "cut all ties". He explained that he tried to resolve the conflict and begged her to explain what was happening. She hung up on him so he tried to call her back and sent several messages. He started to get "real mad." He received a call from Jefferson Parish, which he did not answer. Then he got a message from Ms. Lambert stating "I just called the police, stop harassing me." A childhood friend texted and called him and he shared his frustration with that person.

Defendant confirmed that he decided that Ms. Lambert had to die 12 hours before she was killed. He went on to state that he became enraged after she broke up with him but decided to kill her a few hours later. He remarked that it did not occur to him to sleep it off and potentially reconcile later. He left work and purchased two or three grams of cocaine and started using it. After relapsing, he decided to drive to Metairie with a gun. He carjacked the owner of a green GMC Sierra. He did not remember having the gun then. He got away from the police, then procured more drugs, and agreed on cross-examination that "nothing was going to stop [him] from making sure that [he] f*cked her up." While he drove to Metairie, he replayed "all the things [he] endured" and described his emotions as "through the roof." He testified he was "steady digesting cocaine" and estimated that he used five to seven grams that night.

Defendant testified that when he arrived at Ms. Lambert's apartment, he tapped on the door and waited before kicking it in. He went into a room and saw Ms. Lambert's daughter on the bed. He then checked the bathroom – Ms. Lambert was not there. He said something and fired a shot. He heard a voice, looked under the bed, and saw Ms. Lambert's face. He started shooting again. Ms. Lambert came up briefly before she went back under the bed. He remembered her pleading with him: "Don't do this. Please stop. Leave." He did not remember how many shots he fired and denied aiming consciously. He testified he was just "shooting, shooting around."

Defendant then went back downstairs, drove to a gas station, and used more cocaine. He cried and called his mother for gas money, but did not tell her what was wrong. He stated that something told him to kill himself. He looked up directions to drive back to Baton Rouge, and expressed he felt his "life was gone" and he was an "emotional train wreck." He considered the impact of his action on their families. He recalled his arrest in Baton Rouge, and the realization of what he

had done during his interview with Detective Quaintance. He was "confessing the whole time" and a police officer poured water on him while in was in the back of a police car. He remembered that the officer commented that he looked high and asked him about the gun. Defendant acquired the gun from the street a week or two before the incident for protection.

On November 2, 2023, the jury found Defendant guilty as charged as to count one and guilty of the lesser offense of attempted obstruction of justice as to count two.

On November 11, 2023, Defendant filed a motion for new trial and a motion for acquittal notwithstanding the verdict, which the trial court denied on the record on November 13, 2023, and later issued written denials. On that same date, after waiving sentencing delays, the trial court sentenced Defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on count one and to twenty years imprisonment at hard labor on count two. The court ordered that sentence to run concurrent with count one. This timely appeal followed.

### *ASSIGNMENTS OF ERROR*

1. **The evidence is insufficient to convict Mr. Ross of first degree murder.**
2. **The trial court erred in denying the motion for acquittal notwithstanding the verdict.**
3. **The trial court erred in denying the motion for new trial.**

Defendant argues that the evidence was insufficient to convict him of first degree murder. He argues that he shot Ms. Lambert "in the heat of passion" caused by his anger and confusion after she ended their relationship suddenly, and "without reason". He also avers that, days before the incident, he argued with her about entertaining another man's calls. He urges that he should have been convicted of manslaughter instead.

The State counters that it proved Defendant committed first degree murder. Further, the State contends Ms. Lambert's decision to terminate her romantic relationship with Defendant and the fact that she quit responding to his repeated attempts to contact her via phone call, text message, and email, was not sufficient provocation to deprive an average person of his self-control and cool reflection. The evidence showed that Defendant planned to kill Ms. Lambert 12 hours before he committed the act. The State argues that any reasonable person's anger would have subsided in the length of time it took Defendant to go to his mother's home, arm himself, commit a carjacking, elude the police, and travel from Baton Rouge to Metairie before kicking in an apartment door to search for and kill the victim.

The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La. C.Cr.P. art. 821. *State v. Williams*, 20-46 (La. App. 5 Cir. 12/30/20), 308 So.3d 791, 816, *writ denied*, 21-316 (La. 5/25/21), 316 So.3d 2. In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. *State v. Gatson*, 21-156 (La. App. 5 Cir. 12/29/21), 334 So.3d 1021, 1034. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Woods*, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144,

1155, *writ denied*, 23-1615 (La. 5/29/04), 385 So.3d 700. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Id.*

The directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Aguilar*, 23-34 (La. App. 5 Cir. 11/15/23), 376 So.3d 1105, 1108. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1102. As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at the trial established guilt beyond a reasonable doubt but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id.* at 1103.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *Woods*, 376 So.3d at 1157. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Lavigne*, 22-282 (La. App. 5 Cir. 5/24/23), 365 So.3d 919, 940, *writ not considered*, 23-1119 (La. 10/10/23), 370 So.3d 1086. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Sly*, 23-60 (La. App. 5 Cir. 11/2/23), 376 So.3d 1047, 1072, *writ denied*, 23-1588 (La. 4/23/24), 383 So.3d 608.

In this assignment of error, Defendant challenges the sufficiency of the evidence only with regards to the first degree murder conviction. La. R.S. 14:30(1) defines first degree murder, in pertinent part, as the killing of a human being "[w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of….aggravated burglary[.]"

Upon review of the record, we find that the State presented sufficient evidence under the *Jackson* standard to establish the statutory elements of first degree murder.

Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused as well as the extent and severity of the victim's injuries. *State v. Bone*, 12-34 (La. App. 5 Cir. 9/11/12), 107 So.3d 49, 58, *writ denied*, 12-2229 (La. 4/1/13), 110 So.3d 574. Viewing evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Defendant acted with specific intent to kill when Defendant discharged a lethal weapon aimed in the direction of others. *See State v. Hidalgo*, 95-319 (La. App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197. The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill. *State v. Earls*, 12-448 (La. App. 5 Cir. 12/11/12), 106 So.3d 1149, 1155, *writ denied sub nom. State ex rel. Earls v. State*, 13-132 (La. 9/20/13), 122 So.3d 1012.

Aggravated burglary is defined in La. R.S. 14:60 as the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender, (1) is armed with a dangerous weapon; or (2) after entering, arms himself with a dangerous weapon; or (3) commits a battery upon any person while

in such place, or in entering or leaving such place. In order to prove aggravated burglary, the State must prove beyond a reasonable doubt that the defendant made an unauthorized entry into an inhabited dwelling with the intent to commit a felony or theft therein. *State v. Manning*, 44,403 (La. App. 2 Cir. 6/24/09), 15 So.3d 1204, 1210, *writ denied*, 09-1749 (La. 4/5/10), 31 So.3d 355. In addition, the State must prove beyond a reasonable doubt the existence of one of the three aggravating factors. *Id.*

Here, the State proved Defendant made an unauthorized entry into an inhabited dwelling while armed with a Smith & Wesson pistol. Defendant admitted that he did not have permission to be at the apartment, and he did not have a key. Surveillance video shows Defendant's foot kicking in the victim's door. At trial, a detective described photographs, in evidence, taken of the apartment, which highlighted the damage to the front door and indicated that it had been forced open. Defendant admitted to searching for the victim, then aiming at and shooting the victim once he found her under the bed. The victim died at the scene after sustaining eight gunshot wounds. The victim's daughter also testified that Defendant avoided shooting at her on top of the bed while walking around the bed and aiming under the bed in attempts to shoot her mother. Defendant also testified that he drove to the victim's Metairie residence from Baton Rouge with the intent to kill the victim. Surveillance video also showed his departure, and Defendant was apprehended wearing the same clothes depicted in the footage, with the weapon on his person. The fact that Defendant fired a lethal weapon at the victim supported the jury's finding that Defendant had the specific intent to kill. *See Hidalgo*, 668 So.2d at 1197.

Next, we address Defendant's argument that he should have been convicted of manslaughter rather than first degree murder.

The offense of manslaughter is defined as a homicide that would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31; *State v. Monterroso*, 22-390 (La. App. 5 Cir. 4/26/23), 361 So.3d 1177, 1190, *writ denied*, 23-745 (La. 11/21/23), 373 So.3d 447.

Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Instead, they are mitigating factors that may reduce the grade of the offense. *State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. *State v. Burse*, 19-381 (La. App. 5 Cir. 2/12/20), 289 So.3d 690, 696, *writ denied*, 20-650 (La. 11/24/20), 305 So.3d 104. Provocation and time for cooling are questions of fact for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. *Id.* The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *Id.* Here, we find Defendant has not met his burden of proof.

In *State v. Brumfield*, 93-2404 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 315, the defendant contended that the trial court erred by not reducing his second degree murder conviction to manslaughter. The appellate court acknowledged that a bitter-breakup and the former girlfriend's plan to move out-of-state with his child and her new paramour, the victim, would be upsetting to the average person. Although the victim threatened to kill the defendant a few weeks prior, the jury found these circumstances were not sufficiently provocative to deprive a

reasonable person of his self-control and cool reflection. The evidence established that the defendant told someone he wanted to kill the victim three days prior and had planned to attack the victim before reaching his former girlfriend's apartment. The defendant claimed that he came to visit his daughter, but had not seen her at their usual meeting place for weeks. *Id.* Also, three eyewitnesses testified that he entered the room without speaking and immediately stabbed the victim, who was unarmed, in the back; the victim sustained five other stab wounds in addition to the deadly blow. *Id.* at 314. The defendant then hid from authorities for over six months until his mother revealed his location. Thus, the court held that the jury was justified in finding the mitigating factors were not proven by a preponderance of the evidence. *Id*. at 317.

In *State v. Cheavious*, 03-706 (La. App. 4 Cir. 11/19/03), 862 So.2d 135, 137, the court found defendant guilty of second degree murder of his estranged wife after learning she had called the police on him. The defendant picked their baby up from the babysitter without the victim's consent earlier that day. He arrived at her front door five minutes after the police left, aimed his gun at his wife's neck and fired three shots. The defendant had first attempted to get a gun three days before the shooting and had threatened to kill her "many times" before because he believed that the victim was not caring for the child properly since the couple separated two months before. The court found that the defendant had not proven the presence of mitigating factors by a preponderance of the evidence, where he already had the child in his custody and the child was not currently at risk, and an average person would have had time to think of more rational ways to resolve a suspected child welfare issue in the time the defendant used to plan to kill his wife.

In *Earls*, 106 So.3d at 1154, the defendant argued that killing his former girlfriend's new beau was a "crime of rage," and the evidence supported a

conviction of manslaughter and not second degree murder. He claimed that he lost his ability to reason sensibly when he grappled with the fact that the woman he loved no longer cared for him and had feelings for another man, who he claimed had been mentally and physically abusive towards him. The defendant claimed to be further aggravated by being stopped by the Kenner Police Department an hour before the incident.

In *Earls,* the defendant's former girlfriend told the defendant that she was "talking" to another man. *Id.* at 1152. The former girlfriend told the Defendant that she would be with him if he let her leave the apartment during an altercation. *Id.* After he let her go, she called her new beau. The defendant approached a neighbor's car because he saw his former girlfriend and her beau inside, pulled the car door, and told his former girlfriend to get out of the car so they could talk. *Id.* The beau responded by getting out of the car, pushing the defendant, and stating that she did not have to get out of the car if she didn't want to. *Id.* Defendant walked away and said to another neighbor, "I'm a[sic] kill that b*tch. *Id.* The beau then drove with defendant's former girlfriend to a fast food restaurant before returning to the building. Defendant's former girlfriend and the beau sat in the car for about thirty minutes, then exited the car and talked, then hugged and kissed. Defendant's former girlfriend heard something in the bushes, then someone came out and started shooting. They started running and the former girlfriend entered a neighbor's apartment and that neighbor called the police. Later, the defendant's former girlfriend identified the defendant as the shooter. *Id.* at 1153.

The evidence in *Earls* showed that the defendant had confrontations with his former girlfriend and the victim within a few hours of the shooting. The defendant threatened to kill his former girlfriend approximately an hour and a half before the incident. The defendant also changed his outfit and lay in wait, obscured by the bushes, for the victim and former girlfriend. *Id.* at 1152; 1153. In affirming the

verdict, this Court found that the defendant did not act in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. *Id.* at 1156.

In the instant case, the evidence established that, on June 1, 2021, Defendant spent the night at his mother's house in Baton Rouge FaceTiming the victim. The following day, on June 2, 2021, the victim ended their romantic relationship over the phone while Defendant was at work. He attempted to contact her throughout the day via phone calls and text messages. He explained that he became "real mad" as he tried to understand the situation. Defendant learned that the victim had told him to stop harassing her and called the police. Similar to the defendant in *Earls*, Defendant told another person that he intended to harm Ms. Lambert. He texted and called his childhood friend and his sister between 3:32 p.m. and 7:03 p.m. Defendant texted that the victim had him "ready to just f*ck her up," and complained that she toyed with his emotions, and she was going to learn the biggest lesson of her life. He later texted his friend to ask for forgiveness and express that he was going to miss everyone. Defendant admitted to leaving work to obtain and use cocaine. On the same day, around 11:40 p.m., the police responded to a carjacking in Baton Rouge involving Defendant. He confessed to stealing a truck and later evading the police during a high-speed chase. He admitted he fled to obtain more drugs and a gun, stating, "[N]othing was going to stop [him] from making sure that [he] f*cked her up."

After retrieving the gun, Defendant drove from Baton Rouge to Ms. Lambert's apartment in Metairie, kicked the door in, and searched for her. He found her underneath the bed, and Ms. Lambert pleaded with him to stop and leave. Although he could not remember how many times he fired, Defendant stated in his confession to police that he thought he shot her through the bed and under it. Defendant took care to avoid the victim's daughter during the incident, explaining

that she was lying in bed and that he shot under or around the bed to prevent hitting her. He then got in the carjacked vehicle and returned to Baton Rouge. The coroner's office testified that the autopsy revealed that the victim sustained eight gunshot wounds, including fatal shots to her side and chest, and defensive wounds to her hands.

Defendant admitted that he made the decision to kill the victim twelve hours prior to the shooting – he also stated he made the decision a few hours after she decided that she was not going to be with him. In either case, the break-up between Defendant and Ms. Lambert occurred several hours before the shooting and was not sufficient provocation to deprive an average person of his self-control. Courts have found that a significantly less time was sufficient for the average person to regain his self-control and cool reflection. *See Cheavious*, *supra*; *Earls supra.* Further, the guilty verdict demonstrates that the jury found that the sudden break-up between the victim and Defendant, though painful, was insufficient provocation to deprive an average person of his self-control, and the average person's blood would have cooled between the break-up and the twelve hours leading up to the shooting.

Further, Defendant had a much longer time period than the defendant in *Earls* to reconsider the plan he claimed was formed in "heat of blood". His communications proved he even contemplated the consequences of the choice he made, plus ignored others' pleas to calm down and abort his plan to hurt Ms. Lambert. Thus, viewing the evidence in the light most favorable to the State, we find Defendant also failed to establish the presence of mitigating factors by a preponderance in order to justify a conviction for manslaughter as opposed to first degree murder. *See also State v. Gibson*, 11-1256 (La. App. 1 Cir. 3/23/12), 2012 WL 997002, at *9, *writ denied,* 12-921 (La. 11/9/12), 100 So.3d 827 (finding the defendant was guilty of second degree murder of his "off-again [ . . .]on again"

girlfriend, and that no mitigating factors were established by a preponderance of the evidence where he shot her several times approximately three hours after an associate last accused the victim of "not want[ing]" the defendant anymore and having "someone else.").

Last, the communications between Defendant and others suggest that not only was he confused by Ms. Lambert's sudden change of heart, but he also felt used and abused, particularly financially, by the victim. Defendant stated that she was playing and toying with his feelings and called her "selfish", "lowdown" and "a liar". This Court has found that, although our law may extend some limited indulgence to passion justly excited, it does not indulge revenge. *State v. Franklin,* 11-216 (La. App. 5 Cir. 12/28/11), 87 So.3d 860, 873, *writ denied*, 12-337 (La. 9/12/12), 98 So.3d 811; *Earls*, 106 So.3d at 1156.

In sum, we find no merit in Defendant's first assignment of error. Because we find that the State presented evidence, viewed in a light most favorable to the State, that reasonably permits a finding that Defendant was guilty of first degree murder, the trial court did not err in denying Defendant's motion for acquittal. *See* La. C.Cr.P. art. 821. B. Similarly, the verdict was not contrary to the law and evidence, and Defendant has not otherwise proven that grounds for a new trial exist in his case. *See* La. C.Cr.P. art. 851. Therefore, we also find that Defendant's two remaining assignments of error are without merit.

*ERRORS PATENT DISCUSSION*

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The review reveals no errors patent that require corrective action.

*DECREE*

Considering the foregoing, Defendant's convictions and sentences are affirmed.

**<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 18, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

*Curtis B. Pursell*

**CURTIS B. PURSELL**
CLERK OF COURT

## 24-KA-102

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
JULIET L. CLARK (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          LIEU T. VO CLARK (APPELLANT)

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053